**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Lake Shore Healthcare & Rehabilitation Centre LLC, | ) | Case No. 25-10064 |
| | ) | |
| Alleged Debtor. | ) | Hon. Michael B. Slade |
| | ) | |

**MEMORANDUM OPINION DENYING DEBTOR'S MOTION TO DISMISS**

Three judgment creditors of Lake Shore Healthcare & Rehabilitation Centre LLC

("LSHRC") filed an involuntary chapter 7 petition against it on June 30, 2025.  (Dkt. No. 1)

The Debtor now asks me to dismiss the bankruptcy (Dkt. No. 9) over the Petitioners' objections

(Dkt. Nos. 14 & 15).  Because the statutory grounds for commencing an involuntary filing were

met, it is undisputed that the Debtor is not paying its debts as they become due, and I see no good

reason to dismiss, the Debtor's motion is denied and I will enter an order for relief.

I.

There are no material disputes about the facts underlying the petition or the motion.[1]  The

alleged debtor, LSHRC, previously operated a skilled care nursing home, known as The Mosaic

of Lakeshore, in Chicago.  (Dkt. No. 9, at ¶ 2; Dkt No. 15, Ex. C, Transfer Agreement, at p. 1)

The Mosaic facility and the real property on which it was built was owned by LSH Property LLC

(allegedly an affiliate of LSHRC (Dkt. No. 15, at p. 5)), and sold to a third party, Lakeshore

Prop, LLC (the "Buyer"), in June 2021 (Dkt. No. 9, at ¶ 1) pursuant to an Asset Purchase

---

[1]    At the hearing on October 20, 2025, I asked the parties whether there were any disputed facts that required a
trial.  The parties agreed (Dkt. No. 19, 10/20/25 Hr'g Tr. at 9:17–14:16) that the only facts in dispute were those
related to the diligence of Petitioners' pre-petition efforts to investigate claims (which the Debtor contends were
lacking), LSHRC's cooperation in those efforts (which the Petitioners contend was lacking), and whether the
Petitioners will actually save money from proceeding here rather than in state court.  Those disputes are not
germane to my decision.  No one asked for an evidentiary hearing, and I resolve the Debtor's motion solely on
undisputed facts and documents presented to me relating to LSHRC.

1

Agreement that is not in the record (the "Sale").  (Dkt No. 15, Ex. C, at p. 1)  According to a statement issued by a title company, the Sale consummated on June 30, 2021, and the Buyer paid $28 million—the bulk of which went to paying off bank loans, taxes, and transaction costs, leaving approximately $5.7 million for LSH Property LLC.  (Dkt. No. 15, Ex. G)

It appears that as part of that transaction, the Buyer agreed to lease the Mosaic facility to another third party, Lakeshore Opco, LLC (the "New Operator").  The Debtor and the New Operator entered into an Operations Transfer Agreement dated August 28, 2020 (attached as Exhibit C to Docket No. 15), pursuant to which LSHRC assigned or sold to the New Operator, among other things, its rights to operate the Mosaic facility, its contracts with residents, Medicaid, and Medicare, its regulatory approvals, accounts receivable, books and records, furniture, and "Supplies" (defined as food, central supplies, linens, housekeeping supplies, and similar) (the "Transfer").  (Dkt No. 15, Ex. C, at §§ 3(a)(iv)(A), 4, 6, 7, 9, 27(f); *Id.*, Ex. D, General Assignment).  According to a bill of sale executed by the Debtor on June 30, 2021, the New Operator paid $10.00 to buy the Supplies free and clear of all liens, charges, and encumbrances.  (Dkt. No. 15, Ex. E, Bill of Sale)  Otherwise, the documents in the record do not identify any consideration paid by the New Operator in exchange for the rights and assets transferred to it.  Also as part of the transaction, LSH Property LLC terminated the lease of the Mosaic facility to the Debtor effective June 30, 2021 (Dkt. No. 15, Ex. F, Termination of Lease and Memorandum), with the same person (Nathan Davis) signing the lease termination on behalf of both sides involved in the transaction (*id.*, Ex. F, at pp. 2–3).  It is not clear whether LSH Property LLC paid any consideration for the termination or (because the lease agreement is not in the record) whether it would have been obligated to do so.

Following the Transfer, LSHRC permanently ceased operations.  (Dkt. No. 9, at ¶ 2)  But it does not appear that LSHRC took any formal steps to wind down or dissolve.  (*See* Dkt. No. 15, Ex. B, Deposition of N. Davis, at pp. 22–24)  And the Petitioners obtained three final state court judgments against LSRHC:

- In 2020, Winnie Moore sued LSRHC as administrator of the estate of James Moore, a patient who died under LSRHC's care.  That lawsuit settled and, on February 8, 2023, a state court entered a judgment against LSRHC for $100,000.  (Dkt. No. 15, at p. 3)

- Rita Tromp sued LSRHC as the administrator of the estate of another former LSRHC patient and obtained a judgment for $750,000. (Dkt. No. 1, at ¶ 13)

- New York Healthcare Insurance Company, Inc. ("NYHIC") sued LSRHC, alleging that it failed to pay a deductible owed on an insurance policy.  It won; on October 7, 2024, a state court issued judgment against LSHRC for $115,537.89. (Dkt. No. 14, Ex. B, Order)

LSRHC does not dispute that it owes, but has not satisfied, each of these judgments.

In October 2023, the Petitioners initiated citation proceedings in state court.  (*See* Dkt. 15, at p. 3 & Ex. A, Citation Notice)  LSHRC produced documents and, on April 22, 2025, principal Nathan Davis sat for a citation examination. (Dkt. No. 15, at p. 4 & Ex. B, Deposition; *see also id.* Exs. D–F (identifying Mr. Davis as LSHRC's "authorized signatory" or "manager"))[2] The Petitioners began to develop claims against parties that allegedly received proceeds from the Sale.  (Dkt. No. 14, Ex. D)  Moore avers that even though "$5,717,615.40 in net proceeds were paid out," LSHRC "apparently received nothing while giving away substantially all its assets." (Dkt. No. 15, at p. 5; *see also id.*, Ex. G, at p. 1)  At one point, NYHIC drafted an amended complaint that would have initiated a fraudulent conveyance claim against the recipients of Sale

---

[2]   Davis executed transaction documents that transformed LSRHC (Dkt. No. 15, Ex. B, at 35–40, 43–44; *id.*, Ex. C; *id.*, Ex. D, at p. 3; *id.*, Ex. E, at p. 2; *id.*, Ex. F, at pp. 2, 3) but testified that he had blindly signed documents handed to him by counsel and didn't know even high-level details of the transaction and of the company's financial standing around the time of the transaction, and, further, that he didn't know if he was a manager or owner of the company or if the company had been formally dissolved after the transaction. (*See, e.g., id.*, Ex. B, 22–25, 27–28, 36–44, 53–65, 78, 90:23–91:9)  He did testify, though, that LSRHC transferred operations to an entity whose authorized signatories included a man he "might" have invested in other businesses with (*id.* at 33–34) as well as someone whose daughter was friendly with his (*id.* at 41–42).

proceeds, but opposing counsel threatened to seek sanctions if it was filed.  (Dkt. No. 14, at ¶ 12 & Ex. D)  NYHIC claims it did not immediately file because it decided to do more diligence before filing suit.  (Dkt. No. 19, 10/20/25 Hr'g Tr. at 2:21–3:5)

The parties blame each other for the fact that pre-suit diligence was incomplete as of June 30, 2025.  But the statute of limitations on state law fraudulent transfer claim (four years from consummation of the Sale and Transfer in June of 2021) was about to expire.  And rather than file a suit in state court, the three creditors joined together to initiate this involuntary case.

The Petitioners are candid about their rationale and intent—they want a chapter 7 trustee to be appointed to complete their investigation and, if appropriate, pursue claims for the benefit of themselves and other creditors.  (Dkt. No. 14, at ¶ 14; Dkt. No. 15, at pp. 10, 12; Dkt. No. 19, 10/20/25 Hr'g Tr. at 3:6-9)  The Petitioners concede that the statute of limitations on state law fraudulent conveyance claims would now be expired but for the tolling provision of 11 U.S.C. § 108(a)(2); in fact they argue that the *reason* for their joint involuntary filing was to take advantage of the tolling provision in the Bankruptcy Code.  (Dkt. No. 15, at pp. 9–10; *see also* Dkt. No. 19, 10/20/25 Hr'g Tr. at 3:22–4:15)  Counsel for Moore, moreover, offers to represent a chapter 7 trustee on a contingency fee basis, assuming he could satisfy the standards for an estate engagement (Dkt. No. 15, at p. 10)—suggesting his belief that potential claims have merit.  The pitch the Petitioners make to me is that these bankruptcy proceedings are value-maximizing; they see all upside for creditors.

Time will tell.  This involuntary case will proceed because it was properly filed under 11 U.S.C. §§ 303(a) and (b) and § 303(h) directs me to order relief where (as here) those provisions are satisfied and the debtor is generally not paying its debts as they become due.  I see no statutory basis, under 11 U.S.C. § 707 or otherwise, to dismiss the case at this time.

II.

Involuntary cases are governed by 11 U.S.C. § 303.  That Bankruptcy Code section is both straightforward and "quite liberal in allowing holders of claims to bring involuntary petitions."  *In re Covey*, 650 F.2d 877, 881 (7th Cir. 1981).

Section 303(a) describes who can be an involuntary debtor:  any "person," which includes a corporation, *see* 11 U.S.C. § 101(41), except for corporations that are not "moneyed, business, or commercial," 11 U.S.C. § 303(a).  There is "no requirement that the debtor be an operating business to be eligible for an involuntary chapter 7."  2 COLLIER ON BANKRUPTCY ¶ 303.04[1] (16th ed. 2025).  The carve-out at the end of Section 303(a) essentially means that creditors cannot bring involuntary petitions against non-profit corporations.  LSHRC does not dispute that it can be a debtor under Section 303(a).

Section 303(b) sets forth the criteria for who can file an involuntary petition.  Congress authorized involuntary petitions "by three or more entities, each of which is either a holder of a claim against [the debtor] that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount . . .  if such noncontingent, undisputed claims aggregate at least $21,050 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims."  11 U.S.C. § 303(b)(1).[3]  That is what happened here.  Three Petitioners hold large, unpaid judgments against the Debtor.  None is contingent or disputed as to liability or amount.  *Compare In re Busick*, 831 F.2d 745, 749–50 (7th Cir. 1987) (claims are in "bona fide dispute" if the debtor has a non-frivolous basis to challenge the validity or amount of the debt).[4]

---

[3]    The threshold adjusted from $18,600 to $21,050 on April 1, 2025, prior to the Petition Date.

[4]    The Bankruptcy Code was amended in 1984 to add the requirement that creditors initiating involuntary cases have claims that are not subject to "bona fide dispute as to liability or amount."  11 U.S.C. §303(b)(1).  *See In re Reid*, 773 F.2d 945, 947 (7th Cir. 1985).  Congress could have chosen to further tighten the "liberal" rules permitting involuntary filings, *see Covey*, 650 F.2d at 881, or to add additional requirements for involuntary filings akin to those applicable in voluntary individual chapter 7 filings, *see infra* n. 7, but it did not.

The Debtor's only challenge to whether the statutory requirements to bring an involuntary petition are satisfied here is to invoke the "lien" clause in section 303(b)(1), arguing that because the creditors filed citations to discover assets (creating liens under Illinois law, *see* 735 ILCS § 5/2-1402(m)), their claims do not satisfy section 303(b). (Dkt. No. 9, at ¶¶ 14–17) For the reasons stated in Moore's response (Dkt. No. 15, at pp. 6–8), I disagree. The Petition identifies each claim as unsecured and the Debtor offers no evidence of any "value" to whatever liens exist. *See* 2 COLLIER ON BANKRUPTCY ¶ 303.15 (16th ed. 2025) ("In other words, the dollar requirement can only be composed of either the undersecured portion of the debt owed a petitioning secured creditor or a totally unsecured claim of a petitioning unsecured creditor."). And in any event, the Petition states that the judgments owed are the "[a]mount of the claim above the value of any lien" (Dkt. No. 1 at ¶ 13), which waives any such lien. *See Galleria Mall Invs., LP v. Audette (In re Concepts America, Inc.)*, No. 20-cv-06599, 2024 WL 2209354, at *5 (N.D. Ill. May 15, 2024) ("[W]hen an involuntary petition does not mention security, then 'the only inference which can be drawn' is that the entire sum of the described claim is unsecured." (citing and quoting from *Flori Pipe Co. v. Hale (In re Central Ill. Oil & Refining Co.)*, 133 F.2d 657, 658–59 (7th Cir. 1943))). Indeed, the Debtor seems to have given up on this argument, as it does not respond to Moore's analysis at all in its reply brief. (Dkt. No. 16)[5]

---

[5] I treat the Debtor's failure to respond as a concession. *See, e.g.*, *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010); *Midwest Generation EME, LLC v. Continuum Chem. Corp.*, 768 F. Supp. 2d 939, 950 (N.D. Ill. 2010) ("[F]ailure to respond to an opposing party's argument implies concession."). Perhaps the Debtor did not address Moore's response because it understood its "lien" theory lacked merit, but I am troubled by the fact that the Debtor made this argument at all. The Debtor would need nearly $1 million in otherwise-unencumbered assets for Petitioners' claims to be sufficiently secured by citation liens to render any deficiency claims too small to meet the statutory threshold. But the Debtor permanently suspended operations 4 years ago. (Dkt. No. 9 at ¶ 2) So either the Debtor has as-yet-unidentified assets it refuses to use to satisfy legitimate outstanding claims or it doesn't have any material assets. The motion says the value of the citation "liens against the property of the Putative Debtor far outweighed its assets" (*id*. at ¶ 16), suggesting that the Debtor is representing it has de minimis assets (if any) and may misunderstand that a lien's value is determined by the value of the collateral attached to it, not the amount of the claim it secures. In any event, this is a situation that meets the underlying logic for an involuntary filing: we have an entity making no serious effort to satisfy legitimate debts and creditors need to take matters into their own hands or be left with nothing.

The bottom line is that the case was initiated by a sworn petition from three creditors, each of whom has a noncontingent, unsecured (or at least deficiency) claim larger than $21,050 that is not in bona fide dispute. (Dkt. No. 1) As we have a debtor that qualifies for an involuntary chapter 7 per section 303(a) and creditors that qualify to initiate an involuntary chapter 7 per section 303(b), the statutory criteria for initiating an involuntary case are met.

11 U.S.C. § 303(h) tells me what to do when creditors who qualify under Section 303(b) initiate involuntary proceedings against a debtor that qualifies under Section 303(a): I "shall order relief against the debtor" if it "is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(h)(1). It is undisputed that LSHRC is not paying undisputed, valid debts as they come due. So by statute, I have no discretion; I "shall" (and will) order relief.

### III.

The crux of the dispute presented by the Debtor's motion is whether the three Petitioners did something wrong when they didn't file suit in state court themselves and instead filed this involuntary petition to toll the statute of limitations and preserve fraudulent conveyance claims. The Debtor says that something is amiss and I should either dismiss the case as having been filed "in bad faith" or "abstain" in favor of state court proceedings. If I did either, any fraudulent conveyance claims LSHRC owns would be lost—the Petitioners concede as much. This reality makes the abstention argument nonsensical; I would be "abstaining" in favor of nothing.[6]

---

[6]   I also disagree with the Debtor's abstention theory given that, here, we will have an objective party (a trustee) to assess potential fraudulent transfer claims (and any other claims a trustee might identify), and a single forum in which all such claims will be resolved promptly and collectively. "The principal function of bankruptcy law is to determine and implement in a single collective proceeding the entitlements of all concerned." *In re Am. Reserve Corp.*, 840 F.2d 487, 489 (7th Cir. 1988). The creditors are *not* better off in state court and, while the putative defendants would undoubtedly prefer that any claims against them be vaporized by the statute of limitations, I do not think *the Debtor* is better off in state court either. *See, e.g.*, *In re Westlake Prop. Holdings, LLC*, 606 B.R. 772, 778–79 (Bankr. N.D. Ill. 2019) ("Dismissal under section 305(a)(1) is only appropriate when both 'creditors and the debtor' would be 'better served' by dismissal.").

But more to the point, the Debtor's "bad faith" argument is fundamentally premature. "[T]he issue of bad faith on the part of petitioning creditors is not appropriately before a bankruptcy court for consideration until such time as the involuntary petition is actually dismissed." *In re Basil Street Partners, LLC*, 477 B.R. 846, 848 (Bankr. M.D. Fla. 2012).  By statute, a petitioning creditor's alleged bad faith comes into play only *after* an involuntary petition is dismissed for purposes of determining whether the aggrieved debtor deserves damages.  11 U.S.C. § 303(i).

The Debtor urges me to read into the statute a threshold good faith requirement for filing an involuntary petition, referring me to Third Circuit law that (as it concedes) does not control. *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015) is the case most cited. There, creditors fought in state courts as Forever Green floundered, with its founder selectively paying certain debts that the entity could not pay (and ignoring others).  Spurned creditors joined together to file an involuntary chapter 7 petition.  And while it was "undisputed" that the petitioning creditors "satisfied the statutory criteria for commencing an involuntary bankruptcy case," Forever Green "moved to dismiss the petition as a bad-faith filing."  *Id.* at 331–32.  The bankruptcy court granted the motion, finding that:

> [B]ecause bankruptcy courts are courts of equity, a petitioning creditor (for involuntary bankruptcies) or debtor (for voluntary bankruptcies) must come to the court for a proper purpose.  Involuntary Chapter 7 proceedings . . . are intended to protect creditors from debtors who are making preferential payments to other creditors or from the dissipation of the debtor's assets.  Creditors who file petitions for other reasons—such as to collect on a personal debt, to gain an advantage in pending litigation, or to harass the debtor— act in bad faith.  The Bankruptcy Court concluded that, even though the petitioning creditors met the statutory filing requirements, Charles Dawson was a bad-faith creditor because he was motivated by two improper purposes: to frustrate Forever Green's efforts to litigate its claim against ProGreen and to collect on a debt.

*Id.* at 332.  And the Third Circuit agreed, finding that the petitioners' straightforward argument:

> [O]verlooks the equitable nature of bankruptcy.  Time and again, we have emphasized that "good faith" filing requirements have "strong roots in equity."  At its most

fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy. As courts of equity, bankruptcy courts are equipped with the doctrine of good faith so that they can patrol the border between good- and bad-faith filings. We will not depart from this general "good faith" filing requirement in the context of involuntary petitions for bankruptcy.

*Id.* at 334 (internal quotation marks and citations omitted). Finding that one of the three petitioning creditors was participating in the involuntary filing for what it believed was an improper purpose, the Third Circuit found dismissal for bad faith proper and affirmed the bankruptcy court's decision. *Id.* at 335, 338.

I question the rationale and result of *Forever Green* to the extent that it relies on free-floating concepts of "equity" rather than applying the plain text of the Bankruptcy Code. A Chapter 11 or 13 debtor who proposes a plan must show good faith for the court to confirm it. *See* 11 U.S.C. §§ 1129(a)(3), 1325(a)(3). But good faith is not a statutory requirement to *initiate* a corporate debtor's voluntary or involuntary bankruptcy under *any* Code chapter.[7] Judges do not have authority to add filing requirements into the Bankruptcy Code by fiat. Nor can we limit parties seeking to exercise statutorily granted authority; that's Congress's job. Bankruptcy courts are courts of equity, but we are no more authorized to deny relief provided by the Code than we are to grant relief inconsistent with the Code. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 471 (2017) ("We cannot 'alter the balance struck by the statute,' not even in rare cases."

---

[7] Certain voluntary chapter 7 cases filed by individuals can be dismissed if relief would be "an abuse" of the Bankruptcy Code. 11 U.S.C. § 707(b)(1). And one of the factors Congress directed courts to consider in deciding whether granting an individual relief under chapter 7 would be an "abuse" of the Code in those cases is "whether the debtor filed the petition in bad faith." *Id.* § 707(b)(3)(A). So we know that when Congress wanted courts to consider the motivations for a bankruptcy filing in assessing a request for relief, it said so. No such language appears in Section 303(a), something we must presume was intentional. *See, e.g.*, *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[I]t is a general principle of statutory construction that when 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))); *Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 773 (7th Cir. 2019) (applying same rule of construction); *In re Nockerts*, 357 B.R. 497, 503 (Bankr. E.D. Wis. 2006) (using this "negative pregnant" rule to interpret Section 707 of the Bankruptcy Code).

9

(quoting *Law v. Siegel*, 571 U.S. 415, 427 (2014)) (certain quotation marks omitted)); *see also Netzer v. Off. of Law. Regul.*, 851 F.3d 647, 649 (7th Cir. 2017) ("Courts lack an 'equitable' power to contradict the bankruptcy statutes and rules."); *In re Greenig*, 152 F.3d 631, 635 (7th Cir. 1998) ("[A] bankruptcy court 'cannot use its equitable power to circumvent the law.'" (quoting *Carlson v. United States (In re Carlson)*, 126 F.3d 915, 920 (7th Cir. 1997))).

In my view, the beginning and end of the inquiry is the text of the Bankruptcy Code. "Section 303(b) does not require that an involuntary petition be filed in good faith, any more than section 301 requires that a voluntary petition be filed in good faith." 2 COLLIER ON BANKRUPTCY ¶ 303.16 (16th ed. 2025); *see also Covey*, 650 F.2d at 881 (observing that the Code provisions for initiating an involuntary petition are "quite liberal"); *Basil Street*, 477 B.R., at 849 ("Nowhere in the eligibility requirements of § 303(b) is there any reference to the motivation of the petitioning creditor(s), or any requirement that the petitioning creditor(s) demonstrate either good faith or the absence of bad faith in filing the petition.").

But even if I were inclined to take into account the motivations of the Petitioners, I would not be able to find bad faith here. Courts evaluating whether creditors filed an involuntary petition in bad faith look at whether the petitioners bore ill will or malice, or intended to harass or embarrass the debtor (the "improper purpose" test), or sought to obtain a disproportionate advantage over other creditors (the "improper use" test), or violated Bankruptcy Rule 9011 with the filing. *See, e.g.*, *In re Better Care, Ltd.*, 97 B.R. 405, 410–11 (Bankr. N.D. Ill. 1989); *General Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1501 (11th Cir. 1997); *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 105–06 (2d Cir. 2000). The Petitioners do not fall into any of these categories. They seek to use tools available under law to collect funds allegedly fraudulently transferred from LSHRC for distribution to creditors. What's wrong with that?

10

Maximizing an estate for distribution to creditors is a fundamental—perhaps the fundamental—bankruptcy purpose.  And Congress imbedded in the Bankruptcy Code tools to effectuate that purpose.  *See United States v. Miller*, 604 U.S. 518, 523 (2025) (avoidance powers "help the trustee maximize the value of the bankruptcy estate by enabling the trustee to recover assets that otherwise would have been lost").  It makes no sense to characterize as "bad faith" actions to invoke a procedure Congress enacted where (as here) it is the only way to maximize the value of an enterprise for the benefit of creditors.  Rather, "[c]reditors are justified in filing an involuntary petition where exclusive bankruptcy powers and remedies may be usefully invoked to recover transferred assets, to insur[e] an orderly ranking of creditors' claims and to protect against other creditors obtaining a disproportionate share of debtor's assets."  *In re Meltzer*, 516 B.R. 504, 514–15 (Bankr. N.D. Ill. 2014) (quoting *In re Hentges*, 351 B.R. 758, 772 (Bankr. N.D. Okla. 2006) and *Better Care*, 97 B.R. at 411 (internal quotation marks omitted) (alteration in original)).

Moreover, where good faith is *required* to obtain relief under the text of the Bankruptcy Code (e.g., for plan confirmation), an effort to maximize value for stakeholders typically qualifies.  *See In re S. Beach Sec., Inc.*, 606 F.3d 366, 376 (7th Cir. 2010) ("To be in good faith a plan of reorganization must have a true purpose and fact-based hope of either 'preserving [a] going concern' or 'maximizing property available to satisfy creditors.'" (quoting *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 435 (1999) (alteration in original)).  The Debtor articulates no reason why the same rationale would demonstrate bad faith in the involuntary filing context.  I can't think of one either.

LSHRC's assertion that Petitioners have not "alleged that a bankruptcy filing would prevent the depletion of any estate assets" (Dkt. No. 16, at ¶ 5) is also demonstrably incorrect.  The only assets this debtor appears to have are potential claims against third parties.  And it is

11

undisputed that bankruptcy is the only way for LSHRC to preserve and pursue at least some of those claims for the benefit of its stakeholders. A claim held by a debtor on the petition date is an asset of the estate. *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1343–44 (7th Cir. 1987). At this point there is no way to know for sure, but LSHRC well may have viable claims buried by a leadership team who would be among the ultimate targets. My interest is piqued: the underpinning of at least one plausible claim was described in Moore's opposition and exhibits thereto (Dkt. No. 15, at pp. 2–5 & Exs. B–F), and the substance thereof was ignored in the Debtor's reply (Dkt. No. 16). My questioning of the parties on October 20 did not negate my curiosity, nor did the Debtor's characterization of this effort as harassment (*id.* ¶ 12).[8]

---

[8]   I reviewed the deposition transcript included as Exhibit B to Moore's Response. It appears that counsel for Moore tried to gather relevant information despite obstruction. The witness was confronted with documents that appeared to show LSHRC's affiliate receiving over $5 million from the Sale. (Dkt. No. 15, Ex. B, at 77) Counsel for the witness interposed several improper speaking objections to coach the witness (*see, e.g.*, *id*. at 78:5-9 (Counsel: "I'm again going to object to the question as misleading because you're lumping together different transactions and making it sound like it's one big happy transaction. That's not the way it works. You can answer.")). All counsel should be advised that I will not tolerate similar conduct in cases that are before me.

In any event, the principal most involved in the transaction (or so it seems as he was LSHRC's authorized signatory for various transaction documents, including a lease termination identifying him as LSHRC's manager (Dkt. No. 15, Ex. F)) testified that he really didn't know what happened during the transaction and could not explain it other than confirming that words and numbers were present on documents. A typical answer was, for example, "I'm not going to answer a question that I don't know the proper answer to. If you are asking me to confirm numbers that are on a page with – with words written next to them, I can do that. I'm not going to interpret the balance sheet for what it is or what it's not. That's why we have accountants who prepare these financial statements for us for the nursing home." (*Id.*, Ex. B, at 86:5-12) And that answer was followed shortly thereafter by another objection when the witness was asked whether a large negative number on a post-closing balance sheet (-$3,138,238) was in fact the value of the enterprise following the transaction:

> Counsel for the Witness: Okay. Objection. This is the last time I'm going to let him answer. You're asking him if he believes this statement is accurate and complete. He's not an accountant. He didn't prepare the statement. He's testified 16 times that he doesn't know how to read financial statements, that he can't give you opinions about whether they're accurate. He doesn't have the foundation. Asking a witness repeatedly the same question after he's explained very respectfully that he doesn't have the foundation to answer your question is harassment.

(*Id.*, Ex. B, at 88:11-22) This improper obstruction—combined with the Debtor's decision not to tell its side of the story in its reply brief at all (Dkt. No. 16)—buttresses my conclusion that this case should proceed. While the Debtor made no effort during briefing to articulate why the challenged transaction was legitimate (and appears to have made even less such effort during citation proceedings in state court), the materials before me suggest non-frivolous avoidance claims may well exist, and other claims (such as breach of fiduciary duty claims) might too. *See, e.g.*, *supra* n. 2.

Calling the Petitioners' strategy a "litigation tactic" (Dkt. No. 9 at p. 5, ¶ 24) is pejorative and unhelpful. Many so-called "litigation tactics" are legitimate efforts to exercise legal rights. Again, time will tell, but filing bankruptcy to preserve a claim that Petitioners have shown could have value to the estate and creditors generally is not bad faith.

IV.

If I construed the Debtor's motion as one pursuant to Federal Rule of Civil Procedure 12(b)(6), *see* Fed. R. Bankr. P. 1011(b), I would turn to the provisions of the Bankruptcy Code governing requests to dismiss chapter 7 cases. Section 707 of the Bankruptcy Code describes the circumstances in which it is appropriate for a court to consider, as the title of the section indicates, "[d]ismissal of a case or conversion to a case under chapter 11 or 13." It says:

> (a) The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including—
>
> (1) unreasonable delay by the debtor that is prejudicial to creditors;
>
> (2) nonpayment of any fees or charges required under chapter 123 of title 28; and
>
> (3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on a motion by the United States trustee.

11 U.S.C. § 707(a).

The word "including" at the end of Section 707(a)'s preface means that § 707(a)(1)-(3) is not an exclusive list of the "causes" to dismiss a chapter 7 case; "including" in this context denotes enlargement, not exclusivity. The Bankruptcy Code says so. *See* 11 U.S.C. § 102(3) ("'includes' and 'including' are not limiting"). So do the Supreme Court and Seventh Circuit. *See, e.g.*, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) ("The text employs the terms 'including' and 'such as' in the preamble paragraph to indicate the 'illustrative and not

13

limitative' function of the examples given . . . which thus provide only general guidance . . . ."); *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 943 (7th Cir. 2015) (statutory word "including" is "illustrative and not limitative"); *Richardson v. Nat'l City Bank of Evansville*, 141 F.3d 1228, 1232 (7th Cir. 1998) ("'Include' is a word of illustration, not limitation."). But the way that Section 707(a) is structured suggests that other "causes" for dismissal should usually— in cases not covered by Section 707(b)—be similarly serious or at least somewhat related to the items in the list; if "including" means a list is "illustrative," the list must "illustrate" something. Here, section 707(a)'s enumerated examples suggest that "cause" most frequently means that a chapter 7 case should be dismissed because a party is in some way frustrating its administration. Section 707(a) certainly doesn't suggest that it is appropriate for me to dismiss the case merely because the Petitioners seek to facilitate the pursuit and administration of estate assets in a way that the Debtor would prefer to avoid.

It is possible that Congress used the word "including" as the preface to the list of section 707(a)'s "causes" for dismissal just to give the enumerated items emphasis, serving "the function of making doubly sure that the broad (and intended-to-be-broad) general term is taken to include the specifics." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 204 (2012). But at a minimum, as I have described when interpreting the term "for cause" elsewhere in the Bankruptcy Code, Congress's use of the phrase means that dismissal requires a good reason. *In re Lutheran Home & Servs. for the Aged, Inc.*, 670 B.R. 874, 878 (Bankr. N.D. Ill. 2025). Here, of course, Congress was even more specific—it directed that a properly filed chapter 7 case may be dismissed "*only* for cause" in Section 707(a) and no one seriously disputes that this case was properly filed under Section 303 or offers a *good* reason to dismiss.

14

The cases cited by the Debtor that apply *Forever Green* do so in the way that I am suggesting Section 707(a) should be properly interpreted and applied in the involuntary context, tying "cause" for dismissal to the letter and not just the spirit of the Bankruptcy Code.  In *Meltzer*, 516 B.R. at 516–17, my predecessor dismissed an involuntary petition and sanctioned a creditor for filing it where, among many acts of extreme misconduct, it filed the petition knowing its claim was in bona fide dispute and thus it did not satisfy the statutory criteria under 11 U.S.C. § 303(b)(1).  *See also Reid*, 773 F.2d at 947–48 (reversing appointment of a trustee where the petitioning creditors had claims subject to bona fide dispute).[9]  And similar mishegoss was amok in *In re PTGi Int'l Carrier Serv., Inc.*, 668 B.R. 517, 523 (Bankr. D. Del. 2025), a two-party dispute masquerading as a bankruptcy.  The petitioner driving *PTGi* recruited two other creditors to "meet the technical requirement of numerosity," but it filed the bankruptcy case to substitute for an appeal where it had already *lost* its claim to lien priority in a district court and it had no basis to "suggest that a chapter 7 trustee investigating these transactions would be beneficial to the estate."  *Id.* at 523–24.  Not so here.  The Petitioners seek to facilitate the administration of assets belonging to LSHRC and bring value into an estate in a way that will satisfy creditors better than any ad hoc litigation outside of bankruptcy could given the lapse of time and the non-operating state of the alleged Debtor.

By analogy, if the undisputed facts here were present in a failed Chapter 11 case and a creditor or the United States trustee sought conversion or dismissal, I would convert rather than dismiss.  Courts in such a scenario often use a multifactor test in deciding what to do, assessing "the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors," "whether

---

[9]    *See Busick*, 831 F.2d at 750 (affirming dismissal of involuntary case where creditor's claim was in dispute); *In re Val W Poterek & Sons., Inc.*, 169 B.R. 896, 906 (Bankr. N.D. Ill. 1994) (dismissing involuntary petition filed by creditor that knew its debt had been paid); *In re Fox Island Square P'ship*, 106 B.R. 962, 967 (Bankr. N.D. Ill. 1989) (dismissing involuntary petition initiated by creditor "well aware" its claim was "highly disputed").

conversion or dismissal of the estate would maximize the estate's value as an economic enterprise," "whether any remaining issues would be better resolved outside the bankruptcy forum," and "whether creditors are in need of a chapter 7 case to protect their interests." *In re Green Box NA Green Bay, LLC*, 579 B.R. 504, 511 (Bankr. E.D. Wis. 2017) (citing 7 COLLIER ON BANKRUPTCY ¶ 1112.04[6]). "[T]he above factors help the court compare how creditors would fare inside, as opposed to outside, bankruptcy." *Green Box*, 579 B.R. at 511.

To ask these questions here is to answer them. The parties agree that a chapter 7 trustee would be able to pursue viable claims. The parties also appear to agree that the debtor is defunct, with no other apparent assets. No relief is available to creditors outside this forum and creditors have no other way to protect their interests other than the way that Petitioners have selected. Under these undisputed facts, there is no "cause" for dismissal today. *See In re LLC 1 07CH12487*, 608 B.R. 830, 845–46 (Bankr. N.D. Ill. 2019) ("The bankruptcy court's authority to dismiss, while broad, must be exercised within the strictures of the Bankruptcy Code itself.").

V.

The Third Circuit's decision in *Forever Green* relied on 11 U.S.C. § 303(i) to add "good faith" to the involuntary filing requirements enacted by Congress. 804 F.2d at 334. It provides:

> (i) If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—
>
> > (1) against the petitioners and in favor of the debtor for—
> >
> > > (A) costs; or
> > >
> > > (B) a reasonable attorney's fee; or
> >
> > (2) against any petitioner that filed the petition in bad faith, for—
> >
> > > (A) any damages proximately caused by such filing; or
> > >
> > > (B) punitive damages.

16

11 U.S.C. § 303(i). Per its terms, this section comes into play *after* a non-consensual dismissal and does not add reasons to statutorily *cause* dismissal. *See Marciano v. Fahs (In re Marciano)*, 459 B.R. 27, 45 (9th Cir. BAP 2011) ("Ordinarily, the bankruptcy court would not reach the issue of bad faith unless and until the Involuntary Petition was dismissed."); *Basil Street Partners*, 477 B.R., at 849–50 (bad faith is analyzed "only after the involuntary petition is dismissed"). As the Seventh Circuit described in the context of holding that fee shifting is discretionary when an involuntary petition is dismissed, "Section 303(i) distinguishes between good and bad faith petitions with respect to the type of recovery that may be awarded, but makes no similar distinction as to the district court's initial decision to make an award at all under this subsection." *Susman v Schmid (In re Reid)*, 854 F.2d 156, 160 (7th Cir. 1988).

Section 303(i)(2) creates a standard akin to Federal Rule of Bankruptcy Procedure 9011(b), which prohibits attorneys from submitting pleadings or advocating positions "for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase litigation costs." And some judges have found this concept—part and parcel of any filing—to impliedly interject a requirement that petitioners have good faith motives for initiating an involuntary case. *See Marciano*, 459 B.R. at 62–63 (Markell, J., dissenting). While this argument has more purchase than the "equity" theory of *Forever Green*, there is a slippery slope. Lawyers filing pleadings for improper purposes risk sanctions. But allowing bankruptcy cases to be *dismissed* at their inception because of a judge's view of parties' motives permits the judge to impose their policy preferences and choose what issues facing a putative debtor (or creditors) justify invoking a bankruptcy process. Bankruptcy judges should not use the guise of "bad faith" to pick the types of problems we permit bankruptcy to solve. Congress gets to make those decisions by passing uniform bankruptcy laws, *see* U.S. CONST. art. I, § 8, cl. 4, which we enforce by their

17

terms.  Here, at least as the record stands now, we are nowhere near conduct that might trigger Bankruptcy Rule 9011.

Judge Squires came to a similar conclusion in *Envirodyne Indus., Inc. v. Conn. Mut. Life Co. (In re Envirodyne Indus., Inc.)*, 174 B.R. 986 (Bankr. N.D. Ill. 1994).  The petitioners there were noteholders prohibited by contract from filing suits individually because of a so-called "no action clause" in the relevant indenture.  The debtor sought dismissal, arguing that circumventing that clause by initiating an involuntary case was bad faith.  Judge Squires was "sympathetic" to the debtor's position, *id.* at 997, but found himself bound by the Bankruptcy Code to proceed with the case: "Since § 303(b) was complied with, notwithstanding [the debtor's] unsubstantiated fears and arguments to the contrary, the Defendants were, as a matter of law, within their rights . . . ."  *Id.*  He reasoned that "[i]f [the debtor] seeks a declaration that individual noteholders, who otherwise qualify under 11 U.S.C. § 303(b), are precluded from filing an involuntary petition, then it must take its argument to Congress."  *Id.* at 996–97.  So too here.

## VI.

Now that I am denying the Debtor's motion to dismiss, I will enter an order for relief. Fed. R. Bankr. P. 1013(a)(2).  That will presumably be followed by appointment of a chapter 7 trustee, who will have the duties described in 11 U.S.C. § 704.  The trustee may or may not seek or obtain further, substantive relief.  Indeed, many chapter 7 cases conclude with the filing of a no distribution report and prompt closure by the court clerk without action by me at all.[10]

---

[10]   This result might be better for *the Debtor* than a dismissal—the Debtor would get the finality of discharge even where (as here) it appears to have made no effort to wind up its affairs when it stopped operating.  As I mentioned at the hearing on October 20, 2025, it is important to focus on what is best for *the Debtor* and *the estate*, not the former principals of the Debtor, or related parties, who would no-doubt prefer that any potential claims by the Debtor against them be extinguished by inaction.

18

But Petitioners clearly satisfy the statutory criteria for initiating an involuntary case, and the Debtor does not dispute that in its reply.  (Dkt. No. 16)  No cause for dismissal has been demonstrated.  Nor has the Debtor shown that creditors would be better served by dismissal of the case at this time.  So the text of the Bankruptcy Code, which governs, does not permit me to dismiss or abstain from this case for the reasons advanced by the Debtor *even if* I questioned the Petitioners' motives or was worried that permitting this case to proceed opened the floodgates to more involuntary petitions.

For the reasons stated here, the Debtor's motion to dismiss (Dkt. No. 9) will be denied. A separate order for relief, consistent with Form 7-3, will issue.

Signed:  November 25, 2025          By:  _____

MICHAEL B. SLADE
UNITED STATES BANKRUPTCY JUDGE